IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 10-00261 JSW |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS** |
| v. | |
| JONATHAN HILL, | |
| Defendant. / | |

## INTRODUCTION

Now before the Court for consideration is the Motion to Suppress filed by Defendant Jonathan Hill ("Hill"). The Court has considered the parties' papers, relevant legal authority, the record in this case, and it has had the benefit of oral argument. For the reasons set forth in the remainder of this Order, the Court HEREBY GRANTS IN PART AND DENIES IN PART the motion.

## BACKGROUND

Hill is charged with two counts of production of child pornography, in violation of 18 U.S.C. § 2251(a), one count of receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). These charges stem from Hill's arrest on March 20, 2010, by Marin County Sheriff's Department Deputies Lawrence Matelli ("Deputy Matelli") and Evan Kubota ("Deputy Kubota").[1]

---

[1] In support of his motion, Hill submits copies of the search warrants at issue. The Government, in turn, submits declarations from Deputies Matelli and Kubota. Prior to the hearing, Hill did not submit any declarations that would contradict the facts set forth in

On that day, Deputies Matelli and Kubota responded to a dispatch call in the vicinity of Dixie Elementary School, in San Rafael, California, regarding a man driving a white SUV, who allegedly asked a young girl if she had ever seen a penis and who then allegedly exposed himself to her. (*See* Declaration of Deputy Evan Kubota ("Kubota Decl."), ¶ 2; Declaration of Lawrence Matelli ("Matelli Decl."), ¶ 2, Ex. 2 (CAD Report).)

While en route to the alleged victim's home, the Deputies noticed a white SUV traveling in the opposite direction from them. Because that vehicle had no front license plate, and because the driver "appeared to [be] purposefully avoiding eye contact," with Deputy Matelli, he decided to stop the SUV for the front license plate violation. (Matelli Decl., ¶ 2.) Deputy Matelli attests that he thought the SUV might have been the one described in the dispatch, but "because of the vague description of the vehicle," he was not sure. (*Id.*)[2] Deputy Matelli stopped the SUV and determined that Hill was the driver. (*Id.*, ¶ 3.) Deputy Matelli attests that he smelled alcohol on Hill's breath.

When Deputy Matelli returned to his vehicle with Hill's driver's license and registration, he noticed that the rear of Hill's SUV had "a large number of fishing related stickers on" it. (*Id.*) According to Deputy Matelli, this reminded him of a recent incident he had heard about that occurred in Kentfield, where a man tried to lure juvenile girls into a "white vehicle that the girls described as having numerous fishing-related stickers on the back." (*Id.*) The man involved in that incident was described as having a camouflaged jacket with him, and Deputy Matelli noticed a camouflaged jacket on the front seat of Hill's SUV. According to Deputy Matelli, at that point he "believed that Hill was the man who had just exposed himself to a girl at Dixie School." (*Id.*) Deputy Matelli attests that, because he believed Hill was the

---

those declarations. At the hearing, Hill sought leave to file a declaration from Robert L. Beegle, which responds to statements made in Deputy Matelli's declaration that relate to the justifications for searching Hill's iPhone. For the reasons set forth in its analysis, the Court does not find that the Beegle Declaration creates a material issue of disputed fact that would necessitate an evidentiary hearing on the motion. However, in order to complete the record, Hill shall e-file the Beegle Declaration by no later than January 14, 2011.

[2] Deputy Kubota attests that he "called out the vehicle to Deputy Matelli as a stop for no front license, since the SUV was driving away from the Dixie School area." (Kubota Decl., ¶ 2.) The Court does not find this discrepancy between the Deputies' recollection of the events to be material to the resolution of the motion.

2

man involved in the incident with the young girl, he radioed Deputy Kubota to advise him of this fact and to advise him to bring the victim by for an identification. (*Id.*)

Deputy Matelli then returned to Hill's vehicle and asked him to get out of the car so he could conduct a field sobriety test. (*Id.*, ¶¶ 3-4.) The Government has submitted a CD-Rom which contains approximately sixteen minutes of the encounter between Hill and Deputy Matelli. (*Id.*, Ex. 1 ("Audio Recording").) Deputy Matelli asked Hill, "... straight up, do you know why this is probably all going down?" Hill responded that he did not, and he advised Deputy Matelli that he had been racing cars at a park near Dixie Elementary School with some friends. (Audio Recording at 00:25-01:16, 4:43-5:20.) Approximately seven minutes into the tape, Deputy Matelli advised Hill that he was going to run some tests, because Hill admitted to drinking approximately three beers. It took Deputy Matelli approximately seven minutes to conduct the sobriety tests. (*Id.* at 7:05-14:20.) After he determined that Hill had passed the tests, Deputy Matelli advised Hill that his partner was going to come to talk to him and that they would get him "out of here."

While Deputy Matelli conducted the traffic stop, Deputy Kubota responded to the victim's home, interviewed her, and determined that the man she saw had exposed himself to her. He asked the victim if she could identify the man and the car if he "drove her by them." (Kubota Decl., ¶ 3.) When the victim responded that she thought she would be able to identify the man, Kubota drove them to the location of the traffic stop, and the victim identified Hill as the man who had exposed himself to her. (*Id.*, ¶¶ 3-5, Ex. 1.)[3] Deputy Kubota relayed this information to Deputy Matelli, the victim's father signed a citizen's arrest form, and Deputy Matelli then placed Hill under arrest. (Matelli Decl., ¶ 7; Defendant's Exhibits in Support of Motion to Suppress, Ex. 1 (Affidavit in Support of Search Warrant at 6) (hereinafter "Def. Ex. 1").)[4]

---

[3] To the extent there is a discrepancy between the Deputies' recollection of the events, the Court does not find it material to the resolution of the motion.

[4] At oral argument, the Government conceded that there is no evidence in the record that: (1) during the incident on March 20, 2010, that the victim observed Hill taking photos of her; and (2) that anyone observed the man involved in the incident in Kensington

3

1    Deputy Matelli attests that when he placed Hill under arrest, he handcuffed Hill and kept
2    him by the patrol car. He then searched Hill, emptied his pockets, and took Hill's iPhone from
3    the pocket of Hill's pants. (Matelli Decl., ¶ 8; *see also* Audio Recording at 03:24-03:27 (Hill
4    advising Deputy Matelli that he had cell phone in pocket).) "I told Hill to sit down in the back
5    of my patrol car and immediately began to search the iPhone, while standing next to where he
6    was sitting." (Matelli Decl., ¶ 8.) During that search, Deputy Matelli found photographs of a
7    young girl exposing herself to Hill as well as photographs of Hill exposing himself to her. (*Id.*,
8    ¶ 10; Def. Ex. 1 at 6.)

9    Deputy Matelli also attests that he searched the iPhone immediately after he returned to
10   the Marin County Sheriff's Office and found videos of Hill and the same girl he had seen in the
11   photographs. (Matelli Decl., ¶ 16.) Deputy Kubota interviewed Hill at the Sheriff's Office and
12   attests that during this interview, Hill admitted that: (1) he had taken the pictures of the girl on
13   the iPhone; (2) that he had exposed himself to her; and (3) that he collected child pornography.
14   (Kubota Decl., ¶ 6.) As a result of the information they obtained on the night of Hill's arrest,
15   Deputy Matelli and Detective Salma Tijero obtained four search warrants to search two
16   residences associated with Hill and to search Hill's iPhone, iPod, and other computer media.
17   (Defs. Ex. 1-4.)

18   Deputy Matelli also impounded Hill's SUV and began, but did not complete, an
19   inventory search of the vehicle. (Matelli Decl., ¶ 12.) Deputy Matelli attests that he informed
20   someone at the Marin County Sheriff's Office that the inventory search had not been completed.
21   (*Id.*) On March 26, 2010, Deputy Peterson and Sergeant DeLaO conducted a further search of
22   Hill's SUV. According to the incident report that Deputy Peterson prepared, they conducted
23   this search because "[d]uring the course of this investigation, we had learned that Hill kept child
24   pornography on numerous different mediums [*sic*]. ... We intended to search Hill's car at this
25   time to locate additional media containing contraband that may not have been apparent at the
26   time of his arrest. Due to exigent priorities in this case (locating Jane Doe victims and
27   witnesses), qualified manpower with knowledge of the investigation/suspect sophistication, we
28

taking photos of the girls.

4

1  were not available to conduct the search prior to this date." (Def. Ex. 6 (Marin County Sheriff's
2  Office Incident Report); *see also* Matelli Decl., ¶¶ 12, 15.)[5] During the course of this search,
3  Deputy Peterson opened the center console, removed documents and trash, and found an iPod at
4  the bottom. When Deputy Peterson turned the iPod on, "a pornographic image immediately
5  appeared." (*Id.*) Deputy Peterson then looked at the iPod's menu and "saw that it contained
6  over 400 pornographic images." (*Id.*)

## ANALYSIS

### A.     The Traffic Stop Did Not Ripen Into a *De Facto* Arrest.

Hill does not contend that Deputy Matelli's initial decision to stop him for driving without a front license plate was unjustified. He does, however, argue that his detention amounted to a *de facto* arrest unsupported by probable cause. In order to determine whether, or when, an investigative stop ripens into an arrest, a court must examine the totality of the circumstances. *See, e.g., Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also Washington*, 98 F.3d at 1185 (to evaluate the totality of the circumstances, a court may examine the aggressiveness of the police methods, the restraint placed on a suspect's liberty, and the justification for the use of such methods).

Although Deputy Matelli had only a basic description of the suspect's vehicle, Deputy Matelli stopped Hill near Dixie Elementary School. Early in their encounter, Hill admitted to Deputy Matelli that he had been at the school racing cars with friends. Although Deputy Matelli was not alone, he did not call for additional officers to assist with the stop. In addition, there is no indication in the record that Deputy Matelli took any aggressive actions with Hill, such as drawing his firearm. Indeed, the recording provided by the Government demonstrates that Deputy Matelli's tone was friendly and respectful toward Hill, and that Hill cooperated

---

[5] Defendant's Exhibit 6 is attached to his reply brief.

5

with Deputy Matelli.[6]  Finally, Deputy Matelli did not physically restrain Hill during the time he questioned Hill.  Each of these facts weigh against a conclusion that Hill's detention amounted to a *de facto* arrest.  *See Washington*, 98 F.3d at 1188-89 (noting that if such facts are present, detention is more likely to be considered an arrest).

The Court also considers the length of the detention.  *See United States v. Mayo*, 394 F.3d 1271, 1275-76 (9th Cir. 2005) ("Although the duration of detention bears on whether a *Terry* stop is justified, there is no strict time requirement.").  According to the tape submitted by the Government, Mr. Hill was detained for at least sixteen (16) minutes, and the CAD Report shows that the entire incident lasted approximately twenty-two (22) minutes.  (Matelli Decl., Exs. 1, 2.)  In light of the fact that Deputy Matelli was aware that Deputy Kubota had gone to interview the victim and also knew that Deputy Kubota was going to transport the victim to the location of the stop to see if she could identify Hill, the Court finds that the length of the detention was not unreasonable.  *Mayo*, 394 F.3d at 1276 (concluding that defendant was not arrested where detention lasted a maximum of forty minutes and officers obtained new information regarding criminal activity during that time); *cf. Haynie v. County of Los Angeles*, 339 F.3d 1071, 1076 (9th Cir. 2003) (noting that there are no strict time limitations on investigatory stops so long as the officer is pursuing the investigation in a "diligent and reasonable manner" and, in Section 1983 case, concluding that twenty-five to thirty-five minute traffic stop was not unreasonable).

Accordingly, based on the record, the Court finds that Hill's detention lasted no longer than was necessary to effectuate the purpose of the stop and that the methods Deputy Matelli employed "were the least intrusive means reasonably available to verify" his concerns in a short period of time.  *Royer*, 460 U.S. at 500.  The Court concludes that Hill's detention and subsequent arrest were valid and, therefore, DENIES IN PART the motion.

---

[6]  For example, the Audio Recording discloses that Hill had his hands in his pockets because he was cold.  After Hill explained his actions, Deputy Matelli asked if he could search the pockets to make sure he had no weapons and then advised Hill he could continue to use his pockets to keep his hands warm.  In addition, later in the encounter, Hill asked for his jacket because he was cold.  Again, Deputy Matelli granted Hill's request.

**B.     The Searches of Hill's iPhone Were Lawful.[7]**

Deputy Matelli searched Hill's iPhone immediately after he seized it and when they returned to the station. It is undisputed that Deputy Matelli did not have a warrant to do so. A warrantless search is "*per se* unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotation marks and citations omitted).

The Government argues the search was justified as a search incident to a valid arrest, which "is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224 (1973); *see also Arizona v. Gant*, __ U.S. __, 129 S.Ct. 1710, 1716 (2009) ("*Gant*"); *United States v. Maddox*, 614 F.3d 1046, 1048 (9th Cir. 2010). Hill argues otherwise and relies on *Gant*, *Maddox* and *United States v. Park*, 2007 WL 1521573 (N.D. Cal. May 23, 2007) to support his position. The Court finds Hill's arguments unpersuasive and, in reaching its conclusion, is guided by the Supreme Court's decisions in *Robinson*, *United States v. Edwards*, 415 U.S. 800 (1974) and *United States v. Chadwick*, 433 U.S. 1 (1977). The Court also finds persuasive the California Supreme Court's recent decision in *People v. Diaz*, 2011 WL 6158 (Cal. Jan. 3, 2011).[8]

In *Robinson*, the Supreme Court noted that the search-incident-to arrest exception "has historically been formulated into two distinct propositions. The first is that a search may be made *of the person* of the arrestee by virtue of the lawful arrest. The second is that a search may be made *of the area within the control* of the arrestee." *Robinson*, 414 U.S. at 224

---

[7] The Government ultimately sought a warrant to conduct a full forensic examination of Hill's iPhone. (*See* Def. Ex. 5.) As such, this Court's analysis focuses solely on the evidence found when Deputy Matelli searched the iPhone at the time of Hill's arrest and his subsequent search at the station.

[8] Although neither the United States Supreme Court nor the Ninth Circuit have addressed the issue of whether law enforcement officers may search the contents of a cell-phone as a search incident to arrest, numerous federal and state cases have confronted the issue with differing results. *Compare*, *e.g., United States v. Quintana*, 594 F. Supp. 2d 1291, 1298-99 (M.D. Fla. 2009) (concluding search of defendant's cell-phone was not justified as search incident to valid arrest); *Park,* 2007 WL 1511573, at *8-*9 (same); *State v. Smith*, 920 N.E. 2d 949 (same); *with United States v. Finley*, 477 F.3d 250, 259-260 (5th Cir. 2007) (finding search of cell phone was justified as search incident to valid arrest); *United States v. Wurie*, 612 F. Supp. 2d 104, 109-111 (D. Mass. 2009) (same); *Diaz*, 2011 WL 6158, at *5 (same).

7

(emphasis added).[9] In *Robinson*, the police stopped the defendant because they suspected he was driving with a revoked permit, and they then placed him under arrest for that offense. *Robinson*, 414 U.S. at 220. After they placed him under arrest, the police searched the defendant and felt an object in the left pocket of his coat. The police reached into the pocket, removed the object, a crumpled cigarette case, opened it and discovered capsules that contained heroin. *Id.* at 222-23. The Supreme Court concluded that the search did not violate the Fourth Amendment.

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.
>
> ...
>
> Since it is the fact of custodial arrest which gives rise to the authority to search, it is of no moment that Jenks did not indicate any subjective fear of the respondent or that he did not himself suspect that respondent was armed. *Having in the course of a lawful search come upon the crumpled package of cigarettes, he was entitled to inspect it; and when his inspection revealed the heroin capsules, he was entitled to seize them as 'fruits, instrumentalities, or contraband' probative of criminal conduct.*

*Id.* at 236 (emphasis added, footnotes and citations omitted); *see also Gustafson v. Florida*, 414 U.S. 260, 266 (1973) (upholding search of cigarette box containing marijuana cigarettes that was found in defendant's pocket during search of person incident to valid arrest).

In *Edwards*, the defendant was arrested late at night for attempting to break into a Post Office and was taken into custody. During their investigation, the police discovered that the manner of entry was through a window, which had been pried open, and that paint chips were left on the window sill and window screen. The police seized and tested the defendant's

---

[9] The Supreme Court has construed the phrase "the area within his immediate control" mean "'the area from which [a suspect] might gain possession of a weapon or destructible evidence.'" *Gant*, 129 S.Ct. at 1716 (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)).

8

clothing the following morning. *Edwards*, 415 U.S. at 801-02.  The Supreme Court upheld the search on the basis that it was a search incident to a valid arrest, notwithstanding the time lag between defendant's arrest and the search.  "This was no more than taking from [defendant] the effects in his immediate possession that constituted evidence of a crime.  This was and is a normal incident of a custodial arrest, and reasonable delay in effectuating it does not change the fact that [defendant] was no more imposed upon than he could have been at the time and place of the arrest or immediately upon arrival at the place of detention." *Id.*

In contrast, in *Chadwick*, federal agents arrested the defendants, placed them in custody, and seized a locked footlocker, which the agents had probable cause to believe contained narcotics.  About an hour and a half after the arrest, at a federal building, the agents opened and searched the footlocker, while it was under their exclusive control and while the defendants were securely in custody.  *Chadwick*, 433 U.S. at 4-5.  The Supreme Court concluded that the search of the footlocker could not be justified, because "[o]nce law enforcement officers have reduced luggage or other personal property *not immediately associated with the person of the arrestee* to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." *Id.* at 15 (emphasis added).

In *Gant*, officers arrested the defendant for driving with a suspended license, handcuffed him, and locked him in the back of a patrol car.  Thereafter, the officers searched the defendant's car and found cocaine in the pocket of a jacket located on the back seat of the defendant's car.  The Supreme Court noted that the search-incident-to arrest exception "derives from interests in officer safety and evidence preservation." *Gant*, 129 S.Ct. at 1716.  Therefore, "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to arrest exception are absent and the rule does not apply." *Id.*  As such, the Supreme Court held that police may search a "vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* at 1719.

9

1    The Supreme Court also held that "circumstances unique to the vehicle context justify a
2 search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime
3 of arrest might be found in the vehicle.'" *Id.* (quoting *Thornton v. United States*, 541 U.S. 615,
4 632 (2004) (Scalia, J., concurring in judgment)); *see also id.* at 1723-24. Because the defendant
5 in *Gant* was securely in custody at the time of the search and because there was no evidentiary
6 basis for the search, the Court ruled that the search was invalid. *Id.* at 1719.

7    Thus, under *Robinson* and its progeny, when law enforcement officers discover a
8 personal effect on that person, the officers may search that item and the propriety of the search
9 "does not depend on what a court may later decide was the probability in a particular arrest
10 situation that weapons or evidence would in fact be found upon the person of the suspect."
11 *Robinson*, 414 U.S. at 236. In contrast, under *Chadwick* and *Gant*, when law enforcement
12 officers seek to search an item not immediately associated with the person but which is in his or
13 her area of immediate control, "[i]f there is no possibility that an arrestee could reach into the
14 area" that the officers seek to search, the exception does not apply. *Gant*, 129 S.Ct. at 1716; *see
15 also Maddox*, 614 F.3d at 1049 (citing *Chadwick*, 433 U.S. at 15).

16    Hill urges this Court to characterize cell phones as items that are not immediately
17 associated with the person and, thus, urges the Court to follow *Park* rather than the California
18 Supreme Court's recent decision in *Diaz.* In the *Park* case, the court concluded that "for
19 purposes of Fourth Amendment analysis cellular phones should be considered 'possessions
20 within an arrestee's immediate control' and not part of 'the person.'" *Park*, 2007 WL 1521573
21 at *8 (quoting *Chadwick*, 433 U.S. at 16 n.10). The *Park* court's decision was based in part on
22 its conclusion that "modern cellular phones have the capacity for storing immense amounts of
23 private information, ... [and] [i]ndividuals can store highly personal information on their cell
24 phones, and can record their most private thoughts and conversations on their cell phones ...."
25 *Id.*; *see also id.*, at *9 (concluding that a "cellular phone should not be characterized as an
26 element of an individual's clothing or person, but rather as a 'possession[] within an arrestee's
27 immediate control [that has] fourth amendment protection at the station house'") (brackets in
28 original, quoting *United States v. Monclavo Cruz*, 662 F.2d 1285, 1291 (9th Cir. 1981)).

This Court recognizes that many modern cell phones, like computers, are capable of storing large amounts of personal information. However, absent guidance from the Supreme Court or the Ninth Circuit, the Court is unwilling to conclude that a cell-phone that is found in a defendant's clothing and on his person, *as is the case here*, should not be considered an element of the person's clothing. Accordingly, the Court concludes that, on the facts of this case, Hill's iPhone should not be treated any differently than, for example, a wallet taken from a defendant's person. *See, e.g., United States v. Passaro*, 624 F.2d 938, 943-44 (9th Cir. 1980); *United States v. Ziller*, 623 F.2d 562, 562-63 (9th Cir. 1980).[10]

Hill relies on *Maddox* and argues that because he was handcuffed and seated in Deputy Matelli's patrol car when Deputy Matelli searched the iPhone, the search was improper. In *Maddox*, a police officer pulled defendant over for a traffic violation and, when the defendant refused to comply with the officer's directives, the officer took away the defendant's key chain and cell phone and tossed them on the front seat of the defendant's car. The officer then placed the defendant under arrest, handcuffed him and seated the defendant in his patrol car. The officer then searched a vial on the key chain and discovered methamphetamine. *Maddox*, 614 F.3d at 1047.

The Ninth Circuit applied a two-part test and asked "(1) was the searched item 'within the arrestee's *immediate control* when he was arrested'; (2) did 'events occurring after the arrest but before the search ma[k]e the search unreasonable'?" *Id.* at 1048 (brackets in original, emphasis added, quoting *United States v. Turner*, 926 F.2d 883, 887 (9th Cir. 1991)). The court concluded that the search was not justified because, although the key chain had been within the defendant's immediate control at the time he was arrested, at the time the officer conducted the search, he had handcuffed the defendant and placed him in the back of the patrol car.

---

[10] The Court also finds it significant that Deputy Matelli searched the iPhone immediately after it was seized, which further distinguishes this case from the facts in *Park*. In that case, the officers did not search the defendants' cell phones until after they had returned to the station house and, therefore, the searches were not "substantially contemporaneous" with the arrests. *Park*, 2007 WL 1521573 at *7-*8; *see also United States v. Lasalle*, 2007 WL 1390820, at *5-*6 (D. Hawai'i May 9, 2007) (finding search of cell phone invalid where it was not clear whether cell-phone was found on defendant's person and where search was not substantially contemporaneous with arrest).

11

1  Therefore, there was no possibility that the defendant could conceal or destroy the keychain or
2  any items contained therein. Those subsequent events rendered the search unreasonable. *Id.* at
3  1049.

4  The Court finds Hill's reliance on *Maddox* to be unavailing. It is evident from the
5  court's analysis that the *Maddox* case follows the rationale of *Chadwick* and *Gant*, rather than
6  *Robinson* and *Edwards*. Indeed, the *Maddox* court found *Robinson* to be "easily distinguishable
7  from the case before us," because the key chain was not on the defendant's person. *Id.* at 1048
8  n.2; *but see id.* at 1052 (Smith, J. dissenting, noting that the officer took the keys from
9  defendant's hand). In contrast, in this case, it is undisputed that Deputy Matelli retrieved Hill's
10 iPhone from his pants pocket and, therefore, the phone was found on Hill's person. Thus, the
11 Court concludes that the rule of *Robinson* and *Edwards* applies and, under those cases, Deputy
12 Matelli was entitled to search Hill's iPhone. *See also Diaz*, 2011 WL 6158, at *4-5 (concluding
13 that cell phone was immediately associated with defendant's person and, therefore, warrantless
14 search was proper). The Court DENIES, IN PART, Hill's motion on this basis.

15 Hill also challenges Deputy Matelli's search of Hill's iPhone at the station. Because the
16 Court has concluded that Deputy Matelli's initial search of Hill's iPhone was lawful, the Court
17 finds this argument foreclosed by the Ninth Circuit's holding in *United States v. Burnette*, 698
18 F.2d 1038, 1049 (9th Cir. 1983) ("[W]e hold that once an item in an individual's possession has
19 been lawfully seized and searched, subsequent searches of that item, so long as it remains in the
20 legitimate uninterrupted possession of the police, may be conducted without a warrant.")[11] The
21 Court DENIES IN PART Hill's motion on this basis.

22 **C.    The Evidence Obtained from Hill's iPod Shall Be Excluded.**

23 Hill also challenges the warrantless search of his iPod, which occurred approximately
24 six days after Hill's car had been impounded. The Government argues that, because Deputy

---

[11] Hill also argues that the warrants were unsupported by probable cause, because the searches of the iPhone were improper and the information obtained from those searches must be excluded from the warrants. (*See* Mot. at 12:24-15:4.) Because the Court has concluded that Deputy Matelli lawfully searched the iPhone, the Court concludes that the warrants were supported by probable cause. The Court DENIES IN PART Hill's motion on this basis as well.

12

Matelli had not completed the inventory search of Hill's vehicle on the day he arrested Hill, the search of the iPod was part of a lawful inventory search. (*See* Gov. Opp. Br. at 14:6-14.) "It is undisputed that once a vehicle has been impounded, the police may conduct an inventory search." *United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989) (citing *South Dakota v. Opperman,* 428 U.S. 364, 369 (1975)). "The reasons for conducting the inventory search are threefold: (1) the protection of the vehicle owner's property; (2) the protection of police against claims by the owner; and (3) the protection of the police from potential danger." *Id.* (citing *Opperman*, 428 U.S. at 369).

In his incident report, Deputy Peterson states that he and Sgt. DeLaO searched Hill's SUV to find additional computer media, rather than to complete an inventory search. (Def. Ex. 6.) Moreover, an inventory search also must be "carried out in accordance with the standard procedures of the local police department." *Id.* (citing *Opperman,* 428 U.S. at 375). Because the Government has put forth no evidence regarding the standard procedures used by the Marin County Sheriff's Office to conduct inventory searches, the Court cannot conclude the Government has met its burden to show that the search of the iPod is justified as a valid inventory search.

The Government also argues that the Deputy Peterson and Sgt. DeLaO inevitably would have discovered both the iPod and the photographs it contained. Thus, according to the Government, the Court should not exclude evidence found on the iPod. *See United States v. Lang*, 149 F.3d 1044, 1047 (9th Cir. 1998) (applying inevitable discovery doctrine to conclude that district court properly denied motion to suppress where, even though defendant had not been given *Miranda* warnings when he made statements to police advising them of location of drugs, based on officer's experience, officers would have discovered the drugs during a search of the vehicle in which they were located). Again, because the Government has not put forth evidence regarding the Marin County Sheriff's Office standard procedures for inventory searches, this Court cannot conclude that the Deputies would have conducted a proper and lawful inventory search. Accordingly, the Court finds that the Government has not established

by a preponderance of the evidence that Deputies inevitably would have discovered the iPod and the contraband thereon.

Accordingly, Hill's motion is GRANTED IN PART on this basis.

**D.    Hill is Not Entitled to a *Franks* Hearing.**

Hill argues that he is entitled to a *Franks* hearing, because Deputy Matelli did not provide a factual basis to support a conclusion that he had probable cause to believe they would find child pornography in Hill's home. To obtain a *Franks* hearing, Hill must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and demonstrate that the "allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978). Mere negligence will not satisfy this test. *United States v. Burnes*, 816 F.2d 1354, 1358 (9th Cir. 1987).

"In *Franks,* the Court expressly recognized that there is 'a presumption of validity with respect to the affidavit supporting the search warrant,' and also that 'if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.' (footnote omitted)." *Burnes*, 816 F.2d at 1357 (quoting *Franks*, 438 U.S. at 177-78). These same rules apply to alleged omissions. *Id.*

Deputy Matelli explained the reason he believed that Hill's residence would contain evidence of child pornography was based on his training and experience and based on discussions with Inspector Carl Chapman, who also has experience with computer crimes. (*See* Def. Ex. 1 (Affidavit at 7-12).) The Court concludes that Hill has not made a substantial preliminary showing that Deputy Matelli knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the affidavits in support of the search warrants.

Accordingly, the Court DENIES Hill's request for a *Franks* hearing.

**CONCLUSION**

For the foregoing reasons, Hill's motion to suppress is GRANTED IN PART AND DENIED IN PART. The parties shall appear as scheduled on February 3, 2011 at 2:00 p.m., and shall be prepared to set pretrial and trial dates.

If either party believes that the time between the ruling on this motion and February 3, 2011, should be excluded from the Speedy Trial Act calculations, they shall submit the appropriate request to the Court for consideration.

**IT IS SO ORDERED.**

Dated: January 10, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE